**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CORDELL WILLIAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **10 C 162** |
| **v.** | ) | |
| | ) | **Judge John Z. Lee** |
| **PARTHASARATHI GHOSH,** | ) | |
| **WEXFORD HEALTH SERVICES,** | ) | |
| **LATANYA WILLIAMS, IMHOTEP** | ) | |
| **CARTER, and LIPING ZHANG,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Cordell Williams ("Plaintiff") is an inmate incarcerated at Stateville Correctional Center ("Stateville") who suffers from Crohn's disease. He brings this civil rights action pursuant to 42 U.S.C. § 1983 against Defendants LaTanya Williams ("Ms. Williams"), Liping Zhang ("Dr. Zhang"), Parthasarathi Ghosh ("Dr. Ghosh"), Imhotep Carter ("Dr. Carter"), and Wexford Health Services ("Wexford"), alleging deliberate indifference to his serious medical needs in violation of the Eighth Amendment. He seeks monetary damages as well as injunctive relief. Defendants have filed a motion for summary judgment. For the reasons stated herein, Defendants' motion is granted in part and denied in part.

## I. Factual Background

Except where otherwise noted, the following facts are not in material dispute. Plaintiff has been incarcerated in various correctional facilities in Illinois since 1994. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 11, ECF No. 271. In 1998, he was diagnosed with Crohn's disease. *Id.* ¶ 12. Crohn's disease is chronic inflammatory disease of the small intestine and colon. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 6, ECF No. 281. The symptoms of Crohn's disease include diarrhea,

constipation, bloody stool, loss of electrolytes, weight loss, abdominal pain, ulcers, infections, small bowel obstructions, abscesses, and the formation of fistulas between the bowel and other areas of the abdomen. *Id.* It is undisputed that these symptoms are "very painful." *Id.*

## A.    April 2009–August 2009: Lapses in Medications upon Plaintiff's Transfer to Stateville

Plaintiff was transferred to Stateville from another correctional facility on April 8, 2009. Defs.' LR 56.1(a)(3) Stmt. ¶ 14. As of that date, Ms. Williams, Dr. Zhang, and Dr. Ghosh were Wexford employees who worked at Stateville. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 5, 7–8, ECF No. 280. Ms. Williams was a physician's assistant, Dr. Zhang was a staff physician, and Dr. Ghosh was the medical director. *Id.* At the time of Plaintiff's transfer, Ms. Williams, Dr. Zhang, and Dr. Ghosh knew that Plaintiff had Crohn's disease and was taking several medications. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 12.

On April 10, 2009, Plaintiff received a supply of medications for treatment of his Crohn's disease. Defs.' LR 56.1(a)(3) Stmt. ¶ 15. On May 1, 2009, however, his medications were discontinued. *Id.* ¶ 16; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 16–17. Five days later, on May 6, 2009, Ms. Williams learned that Plaintiff was inquiring about the status of his medications. Defs.' LR 56.1(a)(3) Stmt. ¶ 16.[1] Ms. Williams confirmed with Dr. Zhang that Plaintiff's medications should have been continued through September 1, 2009, rather than discontinued on May 1, 2009, and Ms. Williams subsequently submitted a new prescription order for Plaintiff to the pharmacy. *Id.* ¶ 17; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 17. On May 12, 2009, Plaintiff began receiving his medications again. Defs.' LR 56.1(a)(3) Stmt. ¶ 18.

---

[1]    Plaintiff denies this fact, but he neither cites evidence tending to disprove it nor explains the basis of his denial. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 16. The fact is therefore deemed admitted for purposes of Defendants' summary judgment motion. *See* LR 56.1(b)(3)(C); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[W]hen a responding party's statement fails to controvert the facts as set forth in the moving party's statement in the manner dictated by [Local Rule 56.1], those facts shall be deemed admitted for purposes of the motion.").

About six weeks later, on June 23, 2009, Plaintiff developed a headache and passed out in his cell. *Id.* ¶ 20; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 20. Later that day, Ms. Williams evaluated him and ordered a treatment plan that included a prescription for Prednisone, a steroid that reduces inflammation and is used to treat acute symptoms of Crohn's disease. Defs.' LR 56.1(a)(3) Stmt. ¶¶ 21–22. According to Plaintiff, however, he never received the Prednisone. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 21, 23. He posits that he failed to receive it because some of his prescription orders and medical records were listed under the wrong inmate registration number. *Id.* ¶ 23; Defs.' LR 56.1(a)(3) Stmt., Ex. B, Pl.'s Dep., at 54:6–59:10.

On July 9, 2009, Plaintiff was admitted to the Stateville infirmary due to weight loss and rectal bleeding. Defs.' LR 56.1(a)(3) Stmt. ¶ 24; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 24. Dr. Ghosh evaluated Plaintiff and prescribed Prednisone, Bentyl, Azulfidine, and folic acid for treatment of his symptoms. Defs.' LR 56.1(a)(3) Stmt. ¶ 24. Plaintiff claims that, during this evaluation, Dr. Ghosh learned that some of Plaintiff's medical records were listed under the incorrect inmate registration number. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 24.

The following week, on July 16, 2009, Plaintiff returned to the infirmary in significant pain. *Id.* He claims that he informed Ms. Williams at this time that he was not receiving his medications.[2] *Id.* Ms. Williams wrote Plaintiff another prescription for Prednisone later that day. *Id.* Next, around July 23, 2009, Plaintiff returned to the infirmary again, this time complaining of pain in his feet and dehydration. *Id.* He asserts that he still had not received

---

[2]     Plaintiff asserts that he had previously informed Ms. Williams "in early July 2009" that he had not been receiving his medications. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 23 (citing Pl.'s Dep. at 54:6–56:18). But the deposition testimony in which he sources this assertion is not supportive. The Court therefore disregards this assertion. *See Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) ("Factual allegations not properly supported by citation to the record are nullities.").

some of his medications as of this date, although he does not claim to have informed anyone of that fact during this visit to the infirmary. *See id.*

On July 25, 2009, Plaintiff had a check-up appointment with Dr. Ghosh. Defs.' LR 56.1(a)(3) Stmt. ¶ 25. In addition, on July 30, 2009, Dr. Zhang evaluated Plaintiff for complaints of edema. *Id.* ¶ 26. Based on her evaluation, Dr. Zhang recommended that Plaintiff be referred to a gastroenterologist. *Id.* Such outside referrals were handled by Dr. Ghosh as Stateville's medical director. *Id.* ¶ 27. Later that day, Dr. Ghosh secured approval for Plaintiff to be evaluated at an outside facility, and he filled out a Medical Special Services Referral and Report Form ("Referral Form") to refer Plaintiff to a gastroenterologist at the University of Illinois at Chicago (UIC). *Id.* ¶ 28.

On August 11, 2009, Dr. Zhang learned that Plaintiff had written a letter to Dr. Ghosh complaining of abdominal cramps and a lapse in his medications. *Id.* ¶ 29; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 29. In response, Dr. Zhang prescribed Bentyl to alleviate Plaintiff's cramps. Defs.' LR 56.1(a)(3) Stmt. ¶ 29. The prescription order, however, was written using the wrong inmate registration number. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 30. On September 3, 2009, Ms. Williams learned that Plaintiff had not been receiving his medications. *See id.*; Defs.' LR 56.1(a)(3) Stmt. ¶ 30. Accordingly, Ms. Williams followed up with Stateville's pharmacy. Defs.' LR 56.1(a)(3) Stmt. ¶ 30. Pharmacy staff told her that Plaintiff's medications had arrived that day and would be distributed. *See id.*

## B.    September 2009–April 2010

### 1.    UIC Appointments

As a result of Dr. Zhang's recommendation and Dr. Ghosh's referral, Plaintiff was evaluated at UIC Gastroenterology by Dr. Russell Brown ("Dr. Brown") on September 15, 2009.

*Id.* ¶ 31.  Based on his evaluation, Dr. Brown recommended that Plaintiff stop taking Azulfidine and start taking Pentasa.  *Id.*  He also requested Plaintiff's medical records.  *Id.*

Following this initial evaluation at UIC, Dr. Ghosh secured approval for Plaintiff to return for a second evaluation on October 12 and 13, 2009.  *Id.* ¶¶ 32–33.  At this second evaluation, Plaintiff received a CT scan of his abdomen and pelvis.  *Id.* ¶ 32.  According to Plaintiff, the CT scan revealed a large inflammatory mass in the lower right quadrant of his abdomen, but Dr. Brown could not determine whether the mass was infected or merely inflamed, because Stateville had failed to provide the medical records that Dr. Brown had previously requested.  Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 32–33.

Based on the results of the CT scan, Dr. Brown ordered Plaintiff to continue his current medications, as well as to start taking Cipro and Flagyl.  Defs.' LR 56.1(a)(3) Stmt. ¶ 33.  Plaintiff asserts that Dr. Brown also ordered a follow-up appointment with Plaintiff in four weeks so that he could review Plaintiff's medical records and determine the appropriate course of treatment for the mass in his abdomen.  *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 33; *see also* Pl.'s LR 56.1(b)(3)(C) Stmt., Ex. 9, at CW168 (Dr. Brown's medical notes of 10/13/2009).  Defendants point out, however, that the Referral Form corresponding to Dr. Brown's evaluation on October 12 and 13, 2009, does not specifically request such a follow-up.  Defs.' LR 56.1(a)(3) Stmt. ¶ 33; *id.*, Ex. L, at 3 (Referral Form for UIC visit of 10/13/2009).

The parties dispute whether Dr. Ghosh and Dr. Zhang knew that Dr. Brown had requested a four-week follow-up appointment with Plaintiff after evaluating him on October 12 and 13, 2009.  Plaintiff argues that Dr. Ghosh and Dr. Zhang indeed knew about the request.  In support, he points to a medical record dated October 27, 2009, in which Dr. Ghosh noted that he needed to schedule a follow-up appointment for Plaintiff with UIC Gastroenterology.  *See* Pl.'s

LR 56.1(b)(3)(B) Stmt. ¶ 33.  Plaintiff also points to a medical record dated November 19, 2009, in which Dr. Zhang, after examining Plaintiff and prescribing medication for him, likewise noted that Plaintiff should be scheduled for a follow-up appointment at UIC.  *Id.* ¶ 36; *see also* Defs.' LR 56.1(a)(3) Stmt. ¶ 36.  Dr. Ghosh, however, testified that he was unaware that Dr. Brown had requested a follow-up appointment with Plaintiff.  Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 26; Defs.' LR 56.1(a)(3) Stmt., Ex. C, Ghosh Dep., at 102:2–17.  On December 17, 2009, Dr. Ghosh referred Plaintiff for a follow-up appointment at UIC.  *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 37.  Dr. Ghosh testified that he scheduled this appointment based upon his independent determination that an appointment was appropriate, rather than based upon the request from Dr. Brown.  *See id.*; Ghosh Dep. at 102:2–23.  The appointment was originally scheduled for March 23, 2010, but it was later rescheduled for April 13, 2010.  Defs.' LR 56.1(a)(3) Stmt. ¶ 37.

### 2.    Additional Lapses in Medications

In addition to delays surrounding the scheduling of his four-week follow-up at UIC, Plaintiff claims that he experienced multiple lapses in the receipt of his medications throughout late 2009 and early 2010.  First, around October 24, 2009, Plaintiff stopped receiving Prednisone.  Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 16.  After he filed a grievance, his Prednisone prescription was restarted on October 29, 2009.  *Id.*  Next, on December 17, 2009, Plaintiff stopped receiving Pentasa.  *Id.* ¶ 17.  Plaintiff again filed a grievance, and his Pentasa prescription was reinstated about a month later, on January 15, 2010.  *Id.*  On January 26, 2010, Plaintiff again stopped receiving Prednisone.  *See id.* ¶ 13.

On February 1, 2010, Plaintiff saw Ms. Williams for an evaluation.  Defs.' LR 56.1(a)(3) Stmt. ¶ 38.  During this evaluation, Plaintiff inquired about the status of his follow-up appointment at UIC, and he informed Ms. Williams that his Prednisone had been discontinued

the previous week. *Id.* In response, Ms. Williams checked the status of Plaintiff's follow-up appointment and advised Plaintiff that the appointment had already been scheduled. *Id.*; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 27. Additionally, that same day, Ms. Williams prescribed him a two-month supply of Prednisone. Defs.' LR 56.1(a)(3) Stmt. ¶ 38. Plaintiff began receiving Prednisone again three days later, on February 4, 2010. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 13.

On February 9, 2010, Plaintiff submitted a grievance complaining that some of his prescriptions had not been dispensed. *Id.* ¶ 18. Following the submission of this grievance, Plaintiff's prescription for Pentasa was restarted on February 17, 2010, and his prescriptions for Prednisone, folic acid, and iron were restarted on March 25, 2010. *Id.* Plaintiff also claims that he filed a grievance on April 7, 2010, to report that his abdomen was in pain, that he had not been seen in a timely fashion even though he had submitted multiple sick-call requests, and that his medications had yet again been discontinued. *Id.* ¶ 19.[3]

## C. April 2010–October 2014: Plaintiff's Surgery and Post-Surgery Care

On April 13, 2010, Plaintiff visited UIC Gastroenterology for his follow-up appointment with Dr. Brown. Defs.' LR 56.1(a)(3) Stmt. ¶ 39. Dr. Brown recommended adjustments to Plaintiff's medication regime and ordered Plaintiff to return for further evaluation. *Id.* Accordingly, after Dr. Ghosh again secured approval for an outside referral, Plaintiff returned to UIC on June 9, 2010. *Id.* ¶ 40. At that time, Plaintiff's Crohn's disease was found to be clinically stable. *Id.*

On June 14, 2010, however, Plaintiff developed an elevated fever and abdominal pain. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 41. Five days later, on June 19, 2010, he was admitted to UIC, where he remained as an inpatient for about a month. Defs.' 56.1(a)(3) Stmt. ¶ 41. During

---

[3] Defendants deny that this grievance was ever filed, on the ground that the grievance is neither signed by a grievance counselor nor stamped as received. Defs.' Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 19.

that month, Plaintiff underwent surgery comprising a small bowel resection, an ileectomy, and the installation of a colostomy bag. *Id.* ¶ 42. Dr. Brown later testified that the delay between Plaintiff's CT scan in October 2009 and his follow-up appointment in April 2010 possibly contributed to the need for surgery. Pl.'s LR 56.1(b)(3)(C) Stmt., Ex. 1, Brown Dep., at 83:14–85:13; *see also* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 39, 41. On July 22, 2010, Plaintiff was discharged from UIC and returned to Stateville. Defs.' LR 56.1(a)(3) Stmt. ¶ 44.

On October 13, 2010, Plaintiff returned to UIC for a post-surgery follow-up appointment. *Id.* ¶ 47. At that time, UIC physicians ordered that Plaintiff start Remicade infusion treatments at UIC. *See id.* Dr. Robert Carroll ("Dr. Carroll"), a gastroenterologist who treated Plaintiff at UIC around this time, testified that a patient starting Remicade infusions should receive three infusions within the first six weeks of treatment. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 28; Defs.' LR 56.1(a)(3) Stmt., Ex. G, Carroll Dep., at 35:14–36:12. He also testified that, after the initial three infusions, the patient should continue receiving infusions at least once every eight weeks. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 28; Carroll Dep. at 36:13–14.[4]

After Dr. Ghosh secured approval for Plaintiff to receive Remicade treatments at UIC, Plaintiff received his first Remicade infusion in November 2010. Defs.' LR 56.1(a)(3) Stmt. ¶ 48. He received his second Remicade infusion on December 9, 2010. *Id.* ¶ 49. When UIC physicians sent the Referral Form corresponding to the December 9 appointment back to Stateville, they noted on the form: "follow up PRN." *Id.*, Ex. L, at 7 (Referral Form for UIC visit of 12/9/2010). The parties dispute whether this notation gave Defendants knowledge of

---

[4] Defendants acknowledge that Dr. Carroll gave this description of the timeline on which patients receive Remicade infusions, but they deny that his opinion on this matter represents the relevant standard of care in the medical community. Defs.' Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 28 (denying that "[Dr. Carroll or any other medical professional testified that [the] standard of care required Remicade infusions to be performed at least every eight weeks").

whether and when Plaintiff was to be scheduled for additional Remicade infusions at UIC.[5] According to Defendants, "follow up PRN" was an instruction for Stateville medical staff to simply "follow up as needed," and not necessarily to schedule Plaintiff for additional Remicade infusions. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 49. For his part, Plaintiff contends that "follow up PRN" was an instruction to continue scheduling Plaintiff for Remicade infusions on a regular basis, given that Remicade is supposed to be administered every eight weeks rather than on an irregular, "as needed" basis. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 49. During the next year, Plaintiff was not scheduled for any additional Remicade infusions. *See id.* ¶ 54; Defs.' LR 56.1(a)(3) Stmt. ¶¶ 49–54.

In March 2011, Dr. Ghosh left his position as Stateville's medical director. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 5. Dr. Carter took over as Stateville's medical director in July 2011. *Id.* ¶ 6. In September 2011, Dr. Carter learned that Plaintiff was complaining about the lapse in his Remicade treatments. Defs.' LR 56.1(a)(3) Stmt. ¶ 53. In response, on September 22, 2011, Dr. Carter secured approval to refer Plaintiff for an appointment at UIC on December 1, 2011. *Id.* ¶ 54. He noted on the Referral Form for this appointment that Plaintiff's Remicade treatments had been interrupted since December 2010. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 54. Accordingly, on December 1, 2011, Plaintiff went to UIC and received a Remicade infusion for the first time in approximately one year. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 55. When UIC physicians returned Plaintiff's Referral Form for this appointment to Stateville, they noted: "Dr. Carroll strongly recommends that [Plaintiff] receive Remicade infusions per protocol." *Id.*, Ex. L, at 8 (Referral Form of 12/1/2011); *see also* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 54. Plaintiff subsequently returned

---

[5] Notably, Defendants do not argue that Dr. Ghosh did not see the instruction to "follow up PRN." What is more, the evidence indicates that Dr. Ghosh likely did, in fact, see the instruction. On December 10, 2009, he signed the Referral Form corresponding to the December 9 appointment, and his signature appears directly underneath the "follow up PRN" instruction. Defs.' LR 56.1(a)(3) Stmt., Ex. L, at 7.

to UIC for additional Remicade treatments on December 15, 2011, January 26, 2012, and April 11, 2012. Defs.' LR 56.1(a)(3) Stmt. ¶ 60.

In May 2012, Dr. Carter stopped working as Stateville's medical director. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 6. Thereafter, Plaintiff continued receiving Remicade treatments several times each year through 2014. Defs.' LR 56.1(a)(3) Stmt. ¶ 60; *see also id.*, Ex. N (listing all Remicade infusions Plaintiff received from January 2011 through October 2014). In 2013, Dr. Carroll and other physicians found signs of active Crohn's disease in Plaintiff's intestine. Carroll Dep. at 40:16–41:1; *see also* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 61, 65. Dr. Carroll testified that the pre-2013 lapses in Plaintiff's Remicade treatments may have contributed to this continued presence of active disease. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 65; Carroll Dep. at 40:12–21.

### D. Wexford's Policies and Practices

Throughout the time relevant to this lawsuit, Wexford and the State of Illinois had a contract whereby the State agreed to pay Wexford to provide medical services within the Illinois Department of Corrections (IDOC). Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 35. Wexford's contract with the State set forth various policies governing the medical services that Wexford agreed to provide. For example, under the contract, Wexford agreed to ensure that a treatment plan was developed for each IDOC inmate who required ongoing care. *Id.* ¶ 38.

Wexford ran two medical clinics at Stateville. *Id.* ¶ 39. The first clinic was the Chronic Care Unit, which was available only for inmates with certain medical conditions, not including Crohn's disease. *Id.* The second clinic was the Health Care Unit, which provided basic medical services for inmates who did not qualify for the Chronic Care Unit. *Id.* To be seen at the Health Care Unit, an inmate was required to submit a "sick-call sheet," which was reviewed by Health Care Unit staff. *Id.* Wexford's policy was to see an inmate at the Health Care Unit within

twenty-four to forty-eight hours after the inmate submitted a sick-call sheet. *Id.* According to Plaintiff, however, this time frame was rarely met because the Health Care Unit was always understaffed. *Id.* Plaintiff bases this assertion in part on the deposition testimony of Shanell Barnett ("Ms. Barnett"), a Wexford employee who worked as a nurse at Stateville from 2008 to 2010. *See id.*; *id.*, Ex. 3, Barnett Dep., at 8:17-9:7 (attesting that inmates could not always be timely seen in the Health Care Unit because of understaffing). He also relies upon the deposition testimony of IDOC's medical director, Louis Shicker ("Dr. Shicker"), who testified that Wexford had "deficiencies in nursing staff" and that IDOC was "always pushing" Wexford to fill its contractual staffing requirements. Pl.'s LR 56.1(b)(3)(C) Stmt., Ex. 2, Shicker Dep., at 45:6–20; *see also* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 42.

When inmates at Stateville needed to be scheduled for off-site appointments at UIC, Wexford was responsible for scheduling the appointments. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 45. It is undisputed that there were sometimes "lags" and long wait times for the scheduling of these appointments. Defs.' Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 45. In addition, from 2010 to 2016, there were often delays in the processing of medical records that the Health Care Unit received from outside specialists. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 43.

## II.  Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Shell v. Smith*, 789 F.3d 715, 717 (7th Cir. 2015). To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, he must "establish some genuine issue for trial such that a reasonable jury

could return a verdict in [his] favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012). In reviewing a motion for summary judgment, the Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). The Court must not make credibility determinations or weigh conflicting evidence. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

### III. Analysis

Plaintiff has brought Eighth Amendment claims against Ms. Williams, Dr. Zhang, Dr. Ghosh, and Dr. Carter, alleging that they demonstrated deliberate indifference to his medical needs by allowing his medications to lapse, refusing to timely schedule his follow-up appointment at UIC, and failing to provide him with proper treatment after his surgery in 2010. In addition, he brings Eighth Amendment claims against Wexford, alleging that Wexford maintains widespread practices through which it demonstrates deliberate indifference to inmates' medical needs.

Defendants have moved for summary judgment on several grounds. First, the four individual Defendants argue that they are entitled to summary judgment because no reasonable jury could find that they acted with subjective deliberate indifference or that their actions caused Plaintiff harm. Relatedly, Defendants argue that Wexford cannot be held liable because Plaintiff has failed to create a genuine dispute of fact as to whether Wexford's practices caused him harm. Finally, Defendants seek summary judgment with regard to Plaintiff's request for injunctive relief. The Court will address each of these issues in turn.

**A.      Deliberate Indifference Claims Against the Individual Defendants**

A prison official's "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).  To prevail on a claim for deliberate indifference, an inmate must show that (1) he had an objectively serious medical need and (2) the defendant was subjectively aware of the inmate's serious medical need but consciously disregarded it.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

With respect to the second, subjective prong of a deliberate indifference claim, "showing mere negligence is not enough."  *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc).  That said, "a plaintiff does not need to show that the official intended harm or believed that harm would occur."  *Id.*  Rather, a reasonable jury can infer a defendant's subjective deliberate indifference based upon evidence that the defendant ignored a request for treatment, substantially departed from accepted professional standards, failed to follow advice from a specialist, persisted in an ineffective course of treatment, or inexplicably delayed treatment.  *Id.* at 729–31.

In addition, when an inmate brings a deliberate indifference claim based upon delay of medical treatment, the inmate not only must prove the objective and subjective components of his claim, but also must offer "verifying medical evidence" that the delay caused harm.  *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008); *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007).  A delay of medical treatment causes harm if it either "exacerbate[s] the injury or unnecessarily prolong[s] pain."  *Petties*, 836 F.3d at 731; *accord Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012).  Verifying medical evidence is evidence that "tends to confirm or corroborate a claim that the delay was detrimental."  *Williams*, 491 F.3d at 715.

## 1.     Ms. Williams

First, Defendants argue that Plaintiff has failed to present sufficient evidence from which a reasonable jury could find that Ms. Williams was deliberately indifferent to his medical needs. In response, Plaintiff maintains that the evidence shows that Ms. Williams showed deliberate indifference to lapses in his medications during the period between his transfer to Stateville in April 2009 and his surgery in June 2010. *See* Pl.'s Opp. at 9–11, ECF No. 279.[6]

It is undisputed that Ms. Williams was aware that Plaintiff had Crohn's disease and was taking medications when he transferred to Stateville. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 12. In addition, Plaintiff has adduced evidence that, on several occasions, Ms. Williams learned that Plaintiff's medications had been discontinued. On each of these occasions, however, Ms. Williams acted promptly to place a new order for Plaintiff's discontinued medications. First, when Ms. Williams learned on May 6, 2009, that Plaintiff's medications had been discontinued, she submitted a new prescription order sometime soon thereafter to the pharmacy, and Plaintiff's medications resumed six days later. *See* Defs.' LR 56.1(a)(3) Stmt. ¶¶ 17–18. Second, when Plaintiff told Ms. Williams on July 16, 2009, that he had not been receiving his medications, Ms. Williams promptly wrote Plaintiff a prescription for Prednisone. Pl.'s LR 56.1(b)(3)(B) Stmt.

---

[6]     In later portions of his brief, Plaintiff also argues that unspecified "Defendants" showed deliberate indifference by failing to timely schedule his follow-up appointment at UIC after October 2009, as well as by delaying his Remicade treatments after his surgery in June 2010. To the extent Plaintiff intends to include Ms. Williams among these unspecified "Defendants," the Court concludes that Plaintiff is not entitled to present such claims against Ms. Williams to a jury. The only evidence in the record about events involving Ms. Williams after October 2009 is the evidence regarding her evaluation of Plaintiff on February 1, 2010. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 38. During that evaluation, Plaintiff merely asked Ms. Williams about the status of his follow-up appointment at UIC, and Ms. Williams confirmed that the appointment had been scheduled. *Id.* There is no evidence that Ms. Williams was ever involved in or responsible for arranging the follow-up appointment or Plaintiff's Remicade treatments. In turn, because there is no evidence of Ms. Williams's personal involvement in these matters, she cannot be held liable under § 1983 with respect to harm arising from them. *See Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation.").

¶ 24.  Next, when Ms. Williams learned on September 3, 2009, that Plaintiff had not been receiving his medications, she immediately followed up with Stateville's pharmacy staff, who told her that Plaintiff's medications had arrived and would be distributed.  Defs.' LR 56.1(a)(3) Stmt. ¶ 30.  Ms. Williams was similarly responsive to Plaintiff's needs when she saw him for an evaluation on February 1, 2010.  At that time, Plaintiff asked about the status of his follow-up appointment at UIC and told Ms. Williams that his Prednisone had been discontinued the week before.  Defs.' LR 56.1(a)(3) Stmt. ¶ 38.  Ms. Williams accordingly checked the status of Plaintiff's already-scheduled appointment and ordered Plaintiff a two-month prescription of Prednisone, which he began receiving three days later.  *Id.*; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 13, 27.

Based upon this evidence, no reasonable jury could find that Ms. Williams acted with conscious disregard to Plaintiff's medical needs.  Rather, each time that Plaintiff informed her that he had not been receiving his medications, she responded by promptly ordering new prescriptions for him.  *See Williams v. Guzman*, 346 F. App'x 102, 106 (7th Cir. 2009) (holding that physician did not act with deliberate indifference where he placed a second order for inmate's medication soon after he learned that the medication had been discontinued); *see also Arnett v. Webster*, 658 F.3d 742, 758 (7th Cir. 2011) (holding that physician's failure to investigate underlying cause of delay in medication when inmate informed him that he had not received his medication was negligent at most and could not support a claim for deliberate indifference).  The result would perhaps be different if Ms. Williams had deliberately prescribed Plaintiff inadequate medications, or if she deliberately renewed orders for some, but not all, of the medications that she knew had been discontinued.  And it would certainly be different if she had refused to see Plaintiff or prescribe him any medication at all—as was the case in *Miller v. Campanella*, 794 F.3d 878 (7th Cir. 2015), which Plaintiff cites in support.  *See id.* at 879–80

(holding that inmate could prove deliberate indifference where medical personnel refused to schedule him for a doctor's appointment or prescribe him medication for two months). But Plaintiff has neither offered evidence tending to show that this is what happened nor otherwise argued in support of such theories. Accordingly, Ms. Williams is entitled to summary judgment in her favor.

### 2. Dr. Zhang

Next, Defendants argue that Plaintiff has also failed to raise a triable issue of fact as to whether Dr. Zhang was deliberately indifferent to his medical needs. For his part, Plaintiff argues that he is entitled to proceed with his claims against Dr. Zhang because she showed deliberate indifference to the lapses in his medications, as well as the delays in the scheduling of his UIC follow-up appointment, during the period from April 2009 to June 2010. *See* Pl.'s Opp. at 9–13.

First, with regard to the lapses in his medications, Plaintiff accuses Dr. Zhang of "arbitrarily discontinu[ing] all of his medications on or about May 1, 2009" and "fail[ng] to reinstate them for 11 days." *Id.* at 10 (citing Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 16–19). Plaintiff's evidence, however, does not support this accusation. Rather, the record is silent as to how Plaintiff's medications were discontinued on May 1, 2009, who discontinued them, and why. Without any evidence on this issue, Dr. Zhang cannot be held liable for deliberate indifference based on the discontinuation of Plaintiff's medication on this date. *See Arnett*, 658 F.3d at 760 (holding that physician could not be held liable for deliberate indifference to inmate's medical needs where inmate failed to adduce evidence that physician was personally responsible for the allegedly inadequate medical treatment).

Relatedly, Plaintiff argues that a jury could infer Dr. Zhang's knowledge of and deliberate indifference to later lapses in his medications because he "made verbal complaints and

filed written complaints" about these issues. Pl.'s Opp. at 10–11. This argument, too, falls short. The evidence shows that Plaintiff communicated in person with Dr. Zhang only twice—namely, when she examined Plaintiff on July 30, 2009, and November 19, 2009. *See* Defs.' LR 56.1(a)(3) Stmt. ¶¶ 26, 36. There is no evidence, however, that Plaintiff told Dr. Zhang about lapses in his medications during either examination. Furthermore, subject to one exception, there is no evidence that Dr. Zhang ever knew about Plaintiff's written complaints regarding such lapses. To be sure, Plaintiff claims that he filed written grievances about lapses in his medications around October 24, 2009, December 17, 2009, February 9, 2010, and April 7, 2010. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 16–19. But he has pointed to no evidence suggesting that Dr. Zhang—or, for that matter, any of the Defendants—knew of these grievances or were responsible for processing them.[7] As such, Plaintiff's written grievances are insufficient to create a genuine dispute as to whether Dr. Zhang knew of the lapses in Plaintiff's medication. *See Petties*, 836 F.3d at 728 (explaining that, to avoid summary judgment on a claim for deliberate indifference to medical needs, "a plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm").

The one exception is that on August 11, 2009, Dr. Zhang learned that Plaintiff had written a letter to Dr. Ghosh complaining of abdominal cramps and a lapse in his medications. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 29; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 29. Although this letter made Dr. Zhang aware of this lapse in medications, a jury could not reasonably conclude that her response to the letter constituted deliberate difference to Plaintiff's medical needs. It is

---

[7]     Plaintiff states that Dr. Zhang and Dr. Ghosh sometimes responded to grievances "[d]uring the period of time that Stateville's [Health Care Unit] was without a nursing director"—that is, from May 2010 to October 2016. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 53; *see also id.*, Ex. 5, Brown-Reed Dep., at 9:4–10:11 (showing that Royce Brown-Reed, Stateville's former director of nursing, left her position in May 2010). But there is no evidence that Dr. Zhang or Dr. Ghosh ever responded to grievances prior to May 2010, the period when Plaintiff's written grievances were purportedly filed.

undisputed that Dr. Zhang responded to the letter by prescribing Bentyl for Plaintiff. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 30. As with respect to Ms. Williams, Plaintiff does not argue that Dr. Zhang prescribed incorrect or inadequate medications in choosing to prescribe Bentyl; nor does he argue that Dr. Zhang should have prescribed other medications, in addition to Bentyl, that she knew Plaintiff was not already receiving. He does point out that Dr. Zhang's prescription order for Bentyl was labeled with the wrong inmate registration number, which may have delayed his receipt of this medication. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 30. But nothing in the record suggests that Dr. Zhang made this mistake deliberately, rather than merely negligently, or that she ever became aware of this error. *See Evans v. Wexford Health Sols.*, No. 13-CV-3411, 2016 WL 826392, at *3 (N.D. Ill. Mar. 3, 2016) (holding that physician's error in miswriting the dosage of inmate's seizure medication was merely negligent and could not rise to the level of deliberate indifference). As such, no jury could reasonably conclude that Dr. Zhang responded to the letter in a manner that rises to a constitutional violation.

Finally, Plaintiff is not entitled to proceed with his claim against Dr. Zhang on the theory that she acted with deliberate indifference to his need for a follow-up appointment at UIC. It is undisputed that appointments with the gastroenterologists at UIC were handled and approved by Dr. Ghosh, not Dr. Zhang. Defs.' LR 56.1(a)(3) Stmt. ¶ 27. Indeed, every time Plaintiff visited UIC for an appointment, the visit was arranged pursuant to approval secured by Dr. Ghosh (or, after Dr. Ghosh left Stateville, by his successor, Dr. Carter). *See id.* ¶¶ 28, 32, 37, 40, 45, 48, 54. Of course, medical staff who lack authority to approve outside referrals may sometimes be held liable for deliberate indifference if they unreasonably delay in recommending referrals to a higher-ranking prison official who does have such authority. *See King v. Chapman*, 4 F. Supp. 3d 1017, 1036 (N.D. Ill. 2013). But here, Plaintiff has not argued that Dr. Zhang deliberately

delayed in recommending referrals to Dr. Ghosh.[8]  Dr. Zhang thus is entitled to summary judgment in her favor.

### 3.  Dr. Ghosh

Next, Defendants contend that Plaintiff has failed to create a genuine dispute of fact as to whether Dr. Ghosh was deliberately indifferent to his medical needs.  In response, Plaintiff argues that a jury could infer Dr. Ghosh's deliberate indifference based upon the lapses in his medications, the delay in scheduling his follow-up appointment at UIC, and the delays in scheduling Remicade treatments after his surgery.  *See* Pl.'s Opp. at 9–14.

Given the evidence Plaintiff has offered, no reasonable jury could find that Dr. Ghosh acted with deliberate indifference by permitting Plaintiff's medications to lapse.  First, Plaintiff has not introduced evidence showing that Dr. Ghosh was ever aware of the lapses in medication. Plaintiff saw Dr. Ghosh for several appointments during the period of time in which he claims his medications lapsed, but he does not claim to have informed Dr. Ghosh of the lapses during any of those appointments.[9]  Moreover, as a separate matter, Plaintiff has not introduced

---

[8]     Even if Plaintiff had premised his deliberate indifference claim against Dr. Zhang on the theory that she unreasonably delayed in recommending a referral, this argument would fail.  The evidence shows that both times Dr. Zhang saw Plaintiff for a medical examination, she recommended that he be scheduled for an appointment at UIC Gastroenterology.  *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 26; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 33.  Thus, no reasonable jury could conclude that Dr. Zhang showed deliberate indifference by failing to recommend Plaintiff for a referral to an outside specialist.

[9]     Plaintiff asserts that, during his appointment with Dr. Ghosh on July 9, 2009, Dr. Ghosh "became aware that [Plaintiff's] medical records and prescription records listed the incorrect inmate Registration Number."  Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 24.  In support, however, Plaintiffs cites deposition testimony in which he does not discuss Dr. Ghosh.  He also cites handwritten medical appointment notes in which his inmate registration number appears above an incorrect registration number that has been crossed out.  *Id.* This evidence falls short of showing that Dr. Ghosh ever became aware that Plaintiff's prescription records listed the incorrect registration number, much less that Dr. Ghosh ever learned—or even suspected—that Plaintiff was not receiving his medications as a result of such inaccurate listings.

evidence that Dr. Ghosh was personally responsible for any lapses in medication.[10]  Without such evidence, Plaintiff cannot prove that Dr. Ghosh "actually knew of and disregarded a substantial risk of harm" involving delays in Plaintiff's receipt of medication.  *Petties*, 836 F.3d at 728 (emphasis omitted); *see also Newell v. Ngu*, 589 F. App'x 782, 786–87 (7th Cir. 2014) (holding that inmate could not prove doctor's deliberate indifference absent evidence that doctor was personally responsible for delays in inmate's medical treatment, even though doctor had knowledge of the delays).

The delay in the scheduling of Plaintiff's follow-up appointment at UIC, however, is a different matter.  According to Plaintiff, based on the CT scan that he received around October 12 and 13, 2009, Dr. Brown requested that Plaintiff be scheduled for a follow-up appointment at UIC in four weeks.  Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 33.  Two weeks later, on October 27, 2009, Dr. Ghosh noted in Plaintiff's medical records that he needed to schedule a follow-up appointment for Plaintiff at UIC Gastroenterology.  *Id.* (citing Pl.'s LR 56.1(b)(3)(C) Stmt., Ex. 8, at CW 2818).  Yet it was not until December 17, 2009, when Dr. Ghosh finally arranged for a follow-up appointment.  Defs.' LR 56.1(a)(3) Stmt. ¶ 37.  The follow-up was originally scheduled for March 2010 and was later rescheduled for April 2010—about six months after the CT scan, and well outside the four-week time frame that Dr. Brown had requested.  *See id.* Drawing reasonable inferences in Plaintiff's favor, a reasonable jury could find from this evidence that Dr. Ghosh knew that Dr. Brown had requested a four-week follow-up appointment but that Dr. Ghosh inexplicably delayed in scheduling the appointment.  Such a finding is sufficient to support an inference that Dr. Ghosh acted with subjective deliberate indifference to

---

[10]  As with regard to Dr. Zhang, Plaintiff claims that Dr. Ghosh "arbitrarily discontinued all of his medications on or about May 1, 2009 and failed to reinstate them for 11 days."  Pl.'s Opp. at 10 (citing Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 16–19).  But the evidence Plaintiff cites in support of this assertion is unsupportive.

Plaintiff's medical needs. *See Petties*, 836 F.3d at 729–30 (explaining that a jury can infer deliberate indifference to an inmate's medical needs based upon a medical defendant's inexplicable delay in treatment or refusal to follow advice from a specialist); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (holding that inmate raised genuine dispute of material fact as to physician's deliberate indifference where physician delayed six months in providing an appointment with a specialist).

Likewise, a reasonable jury could find that Dr. Ghosh acted with deliberate indifference by failing to timely schedule Plaintiff's Remicade treatments after his surgery in 2010. The undisputed evidence shows that Plaintiff received his first and second Remicade treatments in November and December 2010, but that he did not receive a third Remicade treatment until December 2011, an entire year later. *See* Defs.' LR 56.1(a)(3) Stmt. ¶¶ 48–49, 55. Defendants argue that a jury could not infer deliberate indifference from this delay because, according to them, Dr. Ghosh had no knowledge that Plaintiff's Remicade treatments were supposed to be scheduled every eight weeks. *See* Defs.' Mem. Supp. at 10, ECF No. 270. But Plaintiff has presented contrary evidence on this point. In particular, when Plaintiff received his second Remicade treatment on December 9, 2010, UIC physicians instructed the medical staff at Stateville to "follow up PRN." *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 49; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 49. According to Plaintiff, this instruction meant that Dr. Ghosh should follow up by securing approval for a third Remicade treatment within eight weeks. *See* Pl.'s Opp. at 13–14; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 49; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 28. Drawing reasonable inferences in Plaintiff's favor, a jury could conclude that Dr. Ghosh knew from the instruction to "follow up PRN" that he should schedule Plaintiff's third Remicade treatment within eight weeks after the second. In turn, the jury could infer from the delay in scheduling Plaintiff's third Remicade

treatment that Dr. Ghosh acted with deliberate indifference to Plaintiff's post-surgery medical needs. *See Petties*, 836 F.3d at 729–30; *Jones*, 193 F.3d at 490.

Defendants contend that, even if a jury could find for Plaintiff on the issue of Dr. Ghosh's deliberate indifference, Dr. Ghosh would still be entitled to summary judgment because Plaintiff has failed to show that the delays in scheduling his follow-up appointment and his Remicade treatments caused harm. But this argument ignores evidence to the contrary. To prevail on a deliberate indifference claim based upon a delay in treatment, an inmate must offer "verifying medical evidence" that the delay exacerbated his injury or prolonged his pain. *Smith*, 666 F.3d at 1040; *Grieveson*, 538 F.3d at 779. The Seventh Circuit has found this requirement to be met where a plaintiff offers evidence such as expert testimony, medical records, or physicians' notes tending to show that the delay caused harm. *See, e.g.*, *Petties*, 836 F.3d at 732; *Grieveson*, 538 F.3d at 779; *Williams*, 491 F.3d at 715.

Here, Plaintiff points to testimony from gastroenterologists who treated him at UIC. For example, Dr. Brown testified that it was possible that the delay in scheduling Plaintiff's follow-up appointment in late 2009 and early 2010 contributed to Plaintiff's need for surgery in June 2010. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 24 (citing Brown Dep. at 85:8–86:12). Similarly, Dr. Carroll testified that, although Plaintiff has not had "severe complications" since his surgery in 2010, he believes that Plaintiff's Crohn's disease "hasn't been as well controlled as it could be," in light of the fact that he and other UIC physicians found evidence of active Crohn's disease in Plaintiff's intestine in 2013. Carroll Dep. at 40:16–41:1; *see also* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 61, 65. Dr. Carroll further testified that the lapses in Plaintiff's Remicade treatments might have caused this continued presence of active disease. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 65; Carroll Dep. at 40:12–21. Such testimony qualifies as sufficient medical evidence to support Plaintiff's

claim that the delays in the scheduling of his follow-up appointment and Remicade treatments caused him harm.

For these reasons, Dr. Ghosh is not entitled to summary judgment with respect to the delay in the scheduling of Plaintiff's follow-up UIC appointment after his CT scan in October 2009 and the failure to timely schedule Plaintiff's Remicade treatments after his surgery in 2010.

### 4.    Dr. Carter

Last, Defendants argue that Plaintiff cannot show that Dr. Carter acted with deliberate indifference to his medical needs.  For his part, Plaintiff argues that Dr. Carter demonstrated deliberate indifference by failing to timely schedule him for his Remicade treatments.  *See* Pl.'s Opp. at 9–14.

Dr. Carter began working at Stateville in July 2011, at which time Plaintiff had not received Remicade treatments for approximately seven months.  *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 6.  In September 2011, Dr. Carter learned that Plaintiff was complaining about the lapse in his Remicade treatments.  Defs.' LR 56.1(a)(3) Stmt. ¶ 53.  He subsequently referred Plaintiff for a Remicade treatment at UIC on December 1, 2011, noting on the Referral Form that Plaintiff's Remicade treatments had been interrupted since December 2010.  *Id.* ¶ 54; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 54.  After Plaintiff's appointment on December 1, 2011, UIC staff noted on the Referral Form that Dr. Carroll "strongly recommend[ed]" that Plaintiff continue to receive Remicade infusions "per protocol."  Defs.' LR 56.1(a)(3) Stmt., Ex. L, at 8 (Referral Form of 12/1/2011); *see also* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 54.  Plaintiff then received Remicade treatments on December 15, 2011, and January 26, 2012.  Defs.' LR 56.1(a)(3) Stmt. ¶ 60.  After that, however, he waited more than ten weeks before receiving his next treatment on April 11, 2012.  *Id.*  In May 2012, Dr. Carter left his position at Stateville.  Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 6.

Based on this evidence, a jury could reasonably infer that Dr. Carter acted with deliberate indifference to Plaintiff's need for Remicade treatments. First, although he learned in September 2011 that Plaintiff had been complaining about the lapse in his treatments, Dr. Carter did not schedule Plaintiff for a Remicade infusion until December 1, 2011, at least two months later. Defs.' LR 56.1(a)(3) Stmt. ¶¶ 53–54. In addition, although Plaintiff then received three Remicade treatments within a span of about eight weeks (that is, from December 1, 2011, to January 26, 2012), he subsequently had to wait more than ten weeks for the next treatment. *Id.* ¶ 60. Given Dr. Carroll's "strong" recommendation that Plaintiff continue Remicade treatments "per protocol," *id.*, Ex. L, at 8, along with evidence that the protocol was to administer Remicade treatments at least once every eight weeks, *see* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 28, a reasonable jury could conclude that Dr. Carter inexplicably delayed in scheduling Plaintiff's Remicade appointments and failed to follow the advice of a specialist. Such findings are sufficient to support a finding of deliberate indifference at the summary judgment stage. *See Petties*, 836 F.3d at 729 ("One hint of [deliberate indifference] is when a doctor refuses to take instructions from a specialist. Another is when he or she fails to follow an existing protocol.") (citations omitted)); *id.* at 730 (collecting cases where an "inexplicable delay in treatment" could support an inference of deliberate indifference). As such, summary judgment in Dr. Carter's favor is unwarranted.[11]

## B.    Deliberate Indifference Claims Against Wexford

Next, Defendants have moved for summary judgment with regard to Plaintiff's deliberate indifference claims against Wexford. In support of these claims, Plaintiff contends that Wexford

---

[11]    Defendants also argue that Plaintiff cannot show that Dr. Carter's delays in scheduling Plaintiff's Remicade treatments caused Plaintiff any harm. The Court rejects this argument for the same reasons it rejected it above with respect to the claims against Dr. Ghosh.

maintained several widespread practices that systematically deprived him and other inmates of adequate medical care. Specifically, Plaintiff complains about Wexford's purported practices of (1) failing to develop long-term treatment plans for inmates as required by its written policies, (2) understaffing its pharmacy, (3) failing to track medications en route to Stateville from off-site locations, (4) "backlogging" inmates' medical records, (5) failing to timely treat inmates due to understaffing in Stateville's Health Care Unit, and (6) delaying in the scheduling of off-site medical appointments. *See* Pl.'s Opp. at 20–23.

A plaintiff may bring a § 1983 claim for deliberate indifference against Wexford, because Wexford is a private company acting under color of state law. *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016) (citing *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 795–96 (7th Cir. 2014)). To prevail on such a claim, the plaintiff must present evidence that a Wexford policy, practice, or custom was the "direct cause" or "moving force" behind a constitutional violation. *Id.*; *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010).

To show the existence of a policy or practice, the plaintiff need not point to an express written policy; instead, he can prove deliberate indifference by pointing to an implicit policy or a series of bad acts that create an inference of a widespread practice. *See Minix*, 597 F.3d at 832; *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004); *see also Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) ("[T]he plaintiff must demonstrate that there is a policy at issue rather than a random event. This may take the form of an implicit policy or a gap in expressed policies, or a series of violations to lay the premise of deliberate indifference." (internal quotation marks and citations omitted)).

1. **Failing to Develop Long-Term Treatment Plans, Understaffing the Pharmacy, Failing to Track Medications, and Backlogging Records**

Some of the purported practices that Plaintiff challenges are insufficient to sustain a claim for deliberate indifference against Wexford. First, Plaintiff argues that Wexford showed deliberate indifference to his medical needs by failing to develop a long-term treatment plan for him, as was required by Wexford's written policies. Pl.'s Opp. at 20; *see also* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 38. In support of this argument, however, Plaintiff does not offer any evidence that Wexford employees failed to develop long-term treatment plans not only for him, but also for other inmates. Without such evidence, no reasonable jury could find the existence of a widespread practice involving the failure to develop long-term treatment plans. *See, e.g.*, *Montague v. Wexford Health Sources, Inc.*, No. 11 C 5080, 2014 WL 3724953, at *7 (N.D. Ill. July 28, 2014) (granting summary judgment as to inmate's deliberate indifference claim against Wexford based on a purported practice of delaying medical care where inmate presented evidence that he experienced a delay but failed to present evidence that other inmates also experienced delays), *aff'd*, 615 F. App'x 378 (7th Cir. 2015); *see also Chatham*, 839 F.3d at 685 ("[C]laims based on allegations of an unconstitutional municipal practice or custom . . . normally require evidence that the identified practice or custom caused multiple injuries.").

In addition, no reasonable jury could find that Wexford showed deliberate indifference to Plaintiff's medical needs by systematically understaffing its pharmacy at Stateville, failing to implement a system for tracking medications that were sent to Stateville from off-site locations, or backlogging medical records. Even assuming that these practices existed, they cannot support a deliberate indifference claim because there is no evidence that these practices caused or contributed to Plaintiff's harms. With respect to understaffing in the pharmacy and failure to track medications, Plaintiff asserts that harm could flow from "gaps in medication treatment" and

"irregular administration of medication."  Pl.'s Opp. at 22–23.  But he points to no evidence that understaffing at the pharmacy or failure to track medications in fact caused such gaps or irregularities.  Similarly, although Plaintiff adduces evidence that medical records were backlogged "[f]rom 2010 to at least October 2016," Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 43, there is no evidence that he was harmed by the backlogging of medical records during that time period.[12] As such, a jury could not find that these purported practices caused a constitutional violation. *See Thomas*, 604 F.3d at 306–07 (holding that plaintiff could not prevail on deliberate indifference claim premised on a widespread practice of understaffing correctional officers where there was no evidence that understaffing directly caused plaintiff or other inmates to receive inadequate medical treatment).

### 2.  Delaying Medical Treatment Due to Understaffing of the Health Care Unit

Plaintiff's remaining two theories of liability in support of his claims against Wexford fare differently.  First, Plaintiff has offered evidence that Wexford had a practice of understaffing its Health Care Unit, which in turn gave rise to a practice of delaying inmates' receipt of medical treatment beyond the time frame contemplated by Wexford's own policy.  Ms. Barnett, who worked at Stateville as one of Wexford's nurses from 2008 to 2010, testified that an inmate who placed a request to be seen by the Health Care Unit was supposed to be seen within twenty-four to forty-eight hours after submitting the request.  Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 39; Barnett Dep. at 52:23–54:8.  She further testified that inmates were not always seen within that time frame "due to staffing."  Barnett Dep. at 54:9–14.  Additionally, Dr. Shicker confirmed that Wexford

---

[12]    Plaintiff argues that Defendants' failure to provide his medical records to Dr. Brown is an example of a time when he was harmed by the backlogging of medical records.  Pl.'s Opp. at 22.  But the evidence shows that this failure to provide records occurred in September or October of 2009. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 31; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 32–33.  No reasonable jury could find that any backlogging from 2010 to 2016 could have caused Wexford's failure to provide Plaintiff's medical records to Dr. Brown in 2009.

has had "deficiencies in nursing staff" and that IDOC was "always pushing" Wexford to fill its contractual staffing requirements. Shicker Dep. at 45:6–20; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 42. Based on this testimony, the trier of fact could reasonably conclude that Wexford had a widespread practice of delaying inmates' receipt of medical care due to understaffing in its Health Care Unit. *See Woodward*, 368 F.3d at 927 (holding that jury could reasonably find, based upon employees' testimony, that medical services provider had a widespread practice of failing to adequately train employees who provided medical services to inmates).

Furthermore, Plaintiff has offered evidence that, in April 2010, he submitted multiple sick-call requests to be seen by the Health Care Unit for abdominal pain, but that he was not timely scheduled to be seen. *Id.* ¶ 19. This evidence is sufficient to create a triable issue of fact as to whether Plaintiff suffered harm because of Wexford's practice of understaffing its Health Care Unit and thereby delaying inmates' receipt of medical treatment. *See Thomas*, 604 F.3d at 303–04 (holding that plaintiff could prevail on deliberate indifference claim premised on a practice of failing to timely review inmates' medical requests where evidence showed that request forms were not collected every day and plaintiff never received a response after submitting multiple requests). As such, to the extent Plaintiff's deliberate indifference claim against Wexford is based on its purported practice of delaying inmates' medical treatment due to understaffing in the Health Care Unit, Defendants' motion for summary judgment is denied.

### 3. Delaying the Scheduling of Off-Site Appointments

Plaintiff has also created a genuine dispute of fact as to whether he was harmed by Wexford's practice of delaying the scheduling of off-site medical appointments for inmates. Defendants admit that sometimes there were "lags" and "long wait times" associated with Wexford's scheduling of such appointments. Defs.' Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 45.

And, as discussed above, Plaintiff has offered evidence of multiple delays in his off-site follow-up appointment and Remicade treatments. In addition, he has offered evidence that these delays exacerbated the symptoms of his Crohn's disease. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 61, 65; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 2; Brown Dep. at 85:8–86:12; Carroll Dep. at 40:12–41:1. Based on this evidence, a jury could reasonably infer that Wexford's practice of delaying the scheduling of inmates' off-site appointments caused Plaintiff harm. *See Thomas*, 604 F.3d at 303–04. Thus, to the extent Plaintiff's deliberate indifference claim against Wexford is based upon this purported practice, Defendants' motion for summary judgment is denied.

## C.    Claims for Injunctive Relief

Finally, Defendants argue that Plaintiff should be barred from pursuing injunctive relief as to any of his claims, on the ground that the evidence does not show a continuing violation of law and that any request for injunctive relief is thus moot. In his response, Plaintiff makes no arguments in defense of his request for injunctive relief. Moreover, Plaintiff has not presented any evidence regarding his medical needs or treatment after 2014. Without such evidence, Plaintiff cannot show a continuing violation of his constitutional rights forming a basis for injunctive relief. *See Pittman ex rel. Hamilton v. Cty. of Madison*, 746 F.3d 766, 781 n.39 (7th Cir. 2014) (affirming district court's denial of injunctive relief with respect to inmate's claims for deliberate indifference to medical needs and noting that "[i]njunctive relief under § 1983 is proper only when there is a continuing violation of federal law"). Accordingly, Defendants' motion for summary judgment with respect to Plaintiff's request for injunctive relief is granted.

## IV.  Conclusion

For the reasons stated herein, Defendants' motion for summary judgment [269] is granted in part and denied in part. The motion is denied as to Defendant Parthasarathi Ghosh with regard to the delays in scheduling Plaintiff's follow-up appointment at UIC after his CT scan in October

2009, as well as delays in scheduling Plaintiff's treatment after his surgery in 2010. The motion is also denied as to Defendant Imhotep Carter with regard to the delays in scheduling Plaintiff's post-surgery treatment. Finally, the motion is denied as to Defendant Wexford Health Services with regard to its purported practice of delaying inmates' access to medical treatment due to understaffing in the Health Care Unit, as well as its purported practice of delaying the scheduling of inmates' off-site medical appointments. In all other respects, the motion for summary judgment is granted. Defendants LaTanya Williams and Liping Zhang are hereby terminated as Defendants in this case. A status hearing is set for September 21, 2017, at 9:00 AM, at which time the parties should be prepared to set deadlines for pretrial filings, a date for the pretrial conference, and a date for trial.

**IT IS SO ORDERED.**                    **ENTERED    8/31/17**

_____
**John Z. Lee**
**United States District Judge**